UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRENWICK AMERICA REINSURANCE CORPORATION,<br>　　*Plaintiff*,<br>　　　　*v.*<br>CX REINSURANCE COMPANY LIMITED,<br>　　*Defendant*. | Civil No. 3:13cv1264 (JBA)<br><br>May 23, 2014 |

**RULING ON PLAINTIFF'S MOTION TO ENJOIN AND
DEFENDANT'S MOTION TO COMPEL ARBITRATION**

Plaintiff Trenwick America Reinsurance Corporation's ("Trenwick") Complaint [Doc. # 1-1] seeks to permanently enjoin an arbitration initiated by Defendant CX Reinsurance Company Limited ("CX"), which claims amounts due under a reinsurance contract. Trenwick now moves [Doc. # 26] for a temporary restraining order and preliminary injunction enjoining the claim of arbitration. Concurrently, CX moves [Doc. # 28] to compel Trenwick to participate in arbitration. For the reasons that follow, Trenwick's motion for a preliminary injunction is denied and CX's motion to compel arbitration is granted.

**I.　　Facts**

Underlying this dispute is a reinsurance agreement (the "Reinsurance Agreement") between Plaintiff Trenwick and Commercial Casualty Insurance Company of Georgia ("CCIC") in 1997 under which Trenwick agreed to serve as a reinsurer and pay excess liability on claims against CCIC effective April 1, 1997 through April 1, 1998. (Reinsurance Agreement, Ex. A to Pl.'s Mem. Supp. Prelim. Inj. [Doc. # 24].) The Reinsurance Agreement is a contract of indemnity, requiring CCIC to pay a claim before

it seeks reimbursement payments from reinsurers, such as Trenwick. In the case of CCIC's insolvency, however, the Reinsurance Agreement is converted from a contract of indemnity to a contract of liability, requiring Trenwick to pay such claims. While Defendant CX was not a party to this Reinsurance Agreement, Trenwick assumed direct liability to CX through a "cut-through" provision,[1] providing that in the case of CCIC's insolvency, any amounts owed by Trenwick to CCIC would be payable directly to CX, rather than to CCIC.[2] (Reinsurance Agreement, Sched. C2.)

In April 2004, after becoming insolvent, CCIC entered into liquidation. Following years of negotiations, in February 2013, Trenwick and the estate of CCIC entered into the "Commutation Agreement"[3] under which all reinsurance obligations between Trenwick and CCIC were commuted and extinguished.[4] (*See* Commutation

---

[1] A cut-through provision or clause "permits an original insured to bring an action directly against a reinsurer . . . . The cut through clause enables the insured to look directly to the reinsurer for payment and to avoid dealing with the estate or liquidator of a bankrupt insurer." Charles F. Corcoran III, *Reinsurance Litigation: A Primer,* 16 w. New Eng. L. Rev. 41, 43 (1994).

[2] At the time of the cut-through's execution, CX was known as CNA International Reinsurance Company Limited ("CNA") and for Plaintiff the agreement was executed by its predecessor-in-interest, Chartwell Insurance Company ("Chartwell").

[3] "In insurance parlance, a 'commutation' is an agreement whereby existing reinsurance contracts are bought back by the insurance company and terminated, such that the reinsurer has no further liability to the insurance company under those contracts." *Cont'l Cas. Co. v. Commercial Risk Re-Ins. Co.*, No. 07cv 6912 (HDL), 2009 WL 1034951, at *1 (N.D. Ill. Apr. 16, 2009).

[4] The Commutation Agreement provided:

It is the intention of the Parties that the releases contained in [the Commutation Agreement] shall operate to fully and finally settle and discharge each Party's past, present and future claims, causes of action,

Agreement, Ex. B to Pl.'s Mem. Supp.)  In August 2012, before the Commutation Agreement was executed, however, CX invoked the cut-through and billed Trenwick for the 1997 claim of a CX policyholder, Poulson & Associates.  CX's litigation with Poulson & Associates was not settled until mid-2010, after CCIC had already entered into liquidation.  On July 15, 2013, after Trenwick failed to pay the claim, CX sent Trenwick a demand for arbitration, claiming amounts due and owing under the cut-through.  Trenwick now seeks to enjoin arbitration and CX has moved to compel it.

II.   **Discussion**

"The Second Circuit has established a two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement."  *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002).

The cut-through provision provides that Trenwick's obligation to pay CX is subject to "all terms, conditions, retentions and limits of liability" of the Reinsurance

---

> obligations and liabilities to the other Party hereto whether known or unknown, reported or unreported, suspected or unsuspected, by either or both Parties, accrued or yet to accrue, arising directly or indirectly under or in connection with the Reinsurance Agreements, whether or not any of such Reinsurance Agreements are void or voidable.  The Parties acknowledge that full payment of the COMMUTATION AMOUNT will be in complete accord, satisfaction, settlement and commutation of any and all past, current and future liabilities and obligations that each Party owes or may owe to the other arising directly or indirectly under or in connection with the Reinsurance Agreements.

(Commutation Agreement, Art. 2(c).)

Agreement. (Reinsurance Agreement, Sched. C2.) The Reinsurance Agreement in turn contains an arbitration provision providing:

> As a condition precedent to any right of action hereunder, any dispute arising out of this Agreement shall be submitted to the decision of a board of arbitration . . . .

(*Id.*, Art. XXIII.) Based on this Court's ruling in *Trenwick Am. Reinsurance Corp. v. Unionamerica Ins. Co.*, No. 3:13cv94 (JBA), 2013 WL 3716384 (D. Conn. July 12, 2013), Trenwick is not disputing here that under the cut-through provision, there was a binding agreement to arbitrate disputes between it and CX—at least before the Commutation Agreement was executed.

*Unionamerica* was also brought by Trenwick, seeking to enjoin arbitration by an insurer seeking to collect on a cut-through provision after the reinsured company, also CCIC, failed to pay its obligation. 2013 WL 3716384, at *5. The Court held that "Trenwick's assertion that the parties did not agree to arbitrate, merely because Unionamerica is not a party to the Reinsurance Agreement, is without merit, given the plain language of [the cut-through], and the language . . . of the Reinsurance Agreement, to which Trenwick is a party and which expressly references [the cut-through]."[5] *Id.*

Based on *Unionamerica*, Trenwick concedes that while the Reinsurance Agreement was operative, CX would have a right under the cut-through provision to

---

[5] The arbitration clause at issue here is similar to the clause at issue in *Unionamerica*, which the Court held was a broad arbitration provision. *See* 2013 WL 3716384, at *5 ("The use of 'any' to qualify 'dispute' evinces a broad arbitration clause, which gives rise to a presumption of arbitrability."). For the same reasons, the Court concludes that the arbitration clause in this case providing for arbitration of "any dispute arising out of this Agreement" is broad.

invoke the arbitration provision in the Reinsurance Agreement and arbitrate its claims against Trenwick.  (Pl.'s Opp'n to Mot. to Compel [Doc. # 34] at 2.)  It contends however, that the "Commutation Agreement fully and finally commuted and extinguished all reinsurance obligations between Trenwick and CCIC" and thus the "cut-through and the arbitration provision under which CX Re purports to demand arbitration ceased to exist as of February 1, 2013."  (Pl.'s Mem. Supp. at 4.)

> The Commutation Agreement provides:
>
> This Agreement sets forth the entire Agreement between the Parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous written and oral negotiations, understandings or agreements between the Parties pertaining to the subject matter hereof.

(Commutation Agreement, Art. 9(b).)  Trenwick contends that CX's right to arbitrate was "necessarily . . . derivative of (1) Trenwick's agreement to arbitrate with CCIC" and (2) "Trenwick's and CCIC's commutation of the Reinsurance Agreement extinguished the Reinsurance Agreement in its entirety" and thus CX "can have no right to arbitrate disputes with Trenwick because there is nothing from which such a right could be derived."  (Pl.'s Mem. Supp. Prelim. Inj. at 8.)

As CX notes, however, the Commutation Agreement expressly provides only that it supersedes prior agreements "between the Parties" to that agreement, i.e., Trenwick and CCIC, and only with respect to the "subject matter hereof," which CX contends is the Commutation Agreement itself and not obligations under the Reinsurance Agreement.  (Def.'s Mem. Supp. Mot. Compel [Doc. # 29] at 12 & n.11.)  Therefore, CX contends that "Trenwick's obligations to CX survived the termination of the Reinsurance Agreement," because "nothing in the Commutation Agreement even purports to extinguish CX's right

5

to arbitrate" and "because CX was not a party to the Commutation Agreement, the agreement by itself could not have affected its cut-through rights." (*Id.* at 4, 11.)

Citing *Cont'l Cas. Co. v. LaSalle Re Ltd.*, 511 F. Supp. 2d 943 (N.D. Ill. 2007), Plaintiff contends that the Commutation Agreement constituted a valid agreement to extinguish the original Reinsurance Agreement and its corresponding arbitration clause. (Pl.'s Mem. Supp. at 10.)  In *LaSalle*, the parties entered into a commutation agreement that purported to extinguish a reinsurance agreement that the same parties had previously entered into and which contained an arbitration provision.  A clause in the commutation agreement, which is similar to the one at issue in this case, provided that the commutation agreement extinguished all claims under the original reinsurance agreement.[6] *LaSalle*, 511 F. Supp. 2d at 945.  The court noted "that it would be difficult to envision a more clear statement of the parties' intent to extinguish their obligations under the [reinsurance] Agreement" and that the "parties could have included an arbitration clause in the Commutation Agreement, but they chose not to do so." *Id.* at 947–48.  On the basis of the commutation agreement, the court held "that the parties intended to extinguish their duty to arbitrate." *Id.* at 948.

In *LaSalle*, the parties to the original arbitration and commutation agreements were the same and one of those parties sought to compel arbitration.  In contrast, CX is a

---

[6] The commutation agreement purported to "fully and finally terminate, release, determine and fully and finally settle, commute and extinguish all their respective past, present, and future obligations and liabilities, known and unknown, fixed and contingent, under, arising out of, and/or pursuant to the Reinsurance Agreements and any other agreements relating to or arising out of the Reinsurance Agreements." *LaSalle.*, 511 F. Supp. 2d at 945.  There was no cut-through provision at issue in *LaSalle*.

third-party beneficiary that never consented to the Commutation Agreement and contends that under the Reinsurance Agreement it was vested with rights that could only be terminated as provided for in the Reinsurance Agreement itself.  (Def.'s Reply [Doc. # 36] at 4.)  Trenwick maintains that it and "CCIC reserved for themselves in the Reinsurance Agreement and [the cut-through provision] their ability to modify or discharge CX Re's rights under the cut-through, including the right to arbitrate."  (Pl.'s Opp'n at 9.)

The cut-through provision contains the following clause addressing termination and commutation, which each party contends favors its position:

> This Reinsurance Assumption Agreement shall continue in effect, subject to termination in the event of cancellation or termination of the Excess of Loss Reinsurance Agreement.  Upon the occurrence of any such event, [CX] shall be notified by the Reinsurers of such action not less than thirty (30) days prior to the effective date of cancellation or termination of this Reinsurance Assumption Agreement. In no event shall cancellation or termination of this Reinsurance Assumption Agreement affect Reinsurers' obligation to pay amounts properly payable to [CX] by virtue of this Reinsurance Assumption Agreement.  Commutation of the Excess of Loss Reinsurance Agreement in accordance with the terms thereof shall relieve Reinsurers of all liability, known or unknown, under this Reinsurance Assumption Agreement.

(Reinsurance Agreement, Sched. C2.)

Trenwick contends that the provision providing that commutation of the Reinsurance Agreement shall relieve Trenwick of liability demonstrates that "CCIC's and Trenwick's intent was clear: commutation would extinguish all rights under the Reinsurance Agreement, including any rights under the cut-through."  (Pl.'s Mem. Supp. at 12.)  CX emphasizes that the Reinsurance Agreement does not provide Trenwick with a

unilateral right to terminate the cut-through provision but rather provides that cancellation or termination of the Reinsurance Agreement will not affect Trenwick's obligation as reinsurer to pay CX and commutation will relieve it of liability only if it is "in accordance with the terms" set forth in the Reinsurance Agreement. (Def.'s Mem. Supp. at 16–17.) Because (1) only CCIC and not Trenwick had the option to commute, (2) CX was not provided with thirty days' advance notice of termination, and (3) CX billed Trenwick for the Poulson claim before the Commutation Agreement was executed, CX maintains that Trenwick's commutation was not in accordance with the Reinsurance Agreement. (*Id.*)

Thus, resolution of this interpretive conflict requires a determination of whether commutation was "in accordance with the terms" of the Reinsurance Agreement (*see* Reinsurance Agreement, Sched. C2), and whether, as Trenwick claims, the Reinsurance Agreement and Trenwick's obligations thereunder were "extinguished."[7] The Second Circuit has held that where, as here, there is a broad arbitration clause, the arbitrator

---

[7] Trenwick contends that because CX was a third-party beneficiary under the Reinsurance Agreement, the parties to the Reinsurance Agreement, Trenwick and CCIC, "'retain[ed] power to discharge or modify the duty'" owed to CX "'by subsequent agreement,'" accomplished by the Commutation Agreement. (*See* Pl.'s Opp'n at 9, 13 (quoting Restatement (Second) of Contracts § 311(2)).) However, the power to modify the duty owed to a third-party beneficiary "terminates when the beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee." Restatement (Second) of Contracts § 311(3). CX contends that it satisfied both conditions and Trenwick and CCIC could not unilaterally extinguish their obligations to it: it acted in reliance by issuing insurance policies with the knowledge that any losses would be reinsured by CCIC, or, in the event of CCIC's insolvency, by Trenwick; and it presented its claim under the cut-through to Trenwick before Trenwick executed the Commutation Agreement. (*See* Def.'s Reply at 4–5.)

must resolve claims that the contract containing an arbitration provision has been terminated or is no longer in effect. *See McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 522 (2d Cir. 1980) ("If the arbitration clause is broad and arguably covers disputes concerning contract termination, arbitration should be compelled and the arbitrator should decide any claim that the arbitration agreement, because of substantive or temporal limitations, does not cover the underlying dispute.").

For example, in *ACE Capital*, the Second Circuit addressed whether an arbitration provision in a reinsurance agreement survived a subsequent agreement between the same parties to terminate the agreement. It held that "[g]iven the presumption of arbitrability created by the broad arbitration clause here, we conclude that issues presented by the [subsequent agreement]—for example, whether [it] terminates, modifies, or otherwise affects the [reinsurance] Agreement, and whether it incorporates any of the terms of the [reinsurance] Agreement— 'touch matters' within the main agreement to be arbitrated" and thus had to be decided by the arbitrator. 307 F.3d at 27 (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001)); *see also Peerless Importers, Inc. v. Wine, Liquor & Distillery Workers Union Local One*, 903 F.2d 924, 929 (2d Cir. 1990) ([T]he arbitrator should determine any claim of contract termination under a broad arbitration clause . . . ."); *Conn. Gen. Life Ins. Co. v. Houston Scheduling Servs., Inc.*, No. 3:12-CV-01456 (MPS), 2013 WL 4647252, at *10 (D. Conn. Aug. 29, 2013) ("Plaintiff's theory is that, if the contracts were terminated, then the arbitration clause is no longer in force and Plaintiff cannot be compelled to arbitrate its claim. The case law, however, forecloses this argument. Where there is a broad arbitration clause, the arbitrator resolves any claim of contract termination.").

At oral argument, Trenwick attempted to distinguish these cases on the basis that the Commutation Agreement was not a "termination" of the Reinsurance Contract, but rather an extinguishment under the Reinsurance Contract such that it essentially no longer exists and cannot form the basis for CX's demand for arbitration, noting that the cut-through provision differentiates between "termination" and "commutation."[8]  *See Lawyers Title Ins. Corp. v. Bank of N.Y.*, No. 90cv6529 (MBM), 1992 WL 142035, at \*7 (S.D.N.Y. June 8, 1992) ("[C]ontract terms are to be interpreted so as to give meaning, if possible, to all terms . . . .").  Given that CX was not a party to the Commutation Agreement, however, its effect on CX's rights must necessarily be determined by interpreting the original Reinsurance Agreement.  Thus, regardless of the terminology employed, Trenwick's contention that the arbitration provision is no longer applicable requires interpretation of the underlying contract and *ACE Capital* establishes that this determination must be made by the arbitrator.  *See ACE Capital*, 307 F.3d at 34; *see also Sun Life Assur. Co. of Canada v. Liberty Mut. Ins. Co.*, No. 09cv2133 (JM) (CAB), 2009 WL 4798881, at \*2 (S.D. Cal. Dec. 9, 2009) (rejecting the argument that "the reinsurance contracts were affirmatively terminated when Sun Life paid the commutation amount, therefore there are no operative contracts containing arbitration clauses that compel

---

[8] Trenwick also relies upon the fact that by its own terms, the Reinsurance Agreement expired April 1, 1998, and thus could not have been "terminated" (Pl.'s Mem. Opp'n at 5) but acknowledges that obligations accrued during the life of the agreement but submitted afterwards, such as CX's Poulson claim, would still be valid after expiration of the contract.  At oral argument, Trenwick maintained that the Commutation Agreement created a different remedy for CX to pursue these claims—litigation in the courts of North Carolina—in lieu of the arbitration remedy, which is no longer operative.

arbitration" and framing the issue as "whether a contract has terminated, and whether its arbitration clause therefore still applies," which "is a question for the arbitrator").

Accordingly, the Court concludes that whether CX's claims are subject to arbitration is a question for the arbitrator. Because the only relief sought in the Complaint is to enjoin arbitration, the Court exercises its discretion to dismiss this case. *See Discover Prop. & Cas. Ins. Co. v. Tetco, Inc.*, No. 3:12cv473 (JBA), 2014 WL 685367, at *9 (D. Conn. Feb. 19, 2014); *Lewis Tree Serv., Inc. v. Lucent Technologies, Inc.,* 239 F. Supp. 2d 332, 340 (S.D.N.Y. 2002) ("Because all of Ironman's claims are subject to arbitration, no useful purpose will be served by granting a stay of Ironman's claims and thus its action against the defendants is dismissed.").

### III.   Conclusion

For the reasons set forth above, Trenwick's Motion [Doc. # 26] for a Temporary Restraining Order and Preliminary Injunction is DENIED and CX's Motion [Doc. # 28] to Compel Arbitration is GRANTED. This case is dismissed and the Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 23rd day of May, 2014.